1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10

JIMMY LEROY RAMSEYER,

11                          Petitioner,

12            v.

13    DICK SMELSER,

14                          Respondent.

15

Case No.  C05-5006FDB

REPORT AND
RECOMMENDATION

Noted for September 16, 2005

16        Petitioner is a state prisoner currently incarcerated at the CCA/Prairie Correctional Facility, located

17   in Appleton, Washington.  This matter is before the court on his petition for writ of *habeas corpus* filed

18   with this court on January 5, 2005, pursuant to 28 U.S.C. § 2254. (Dkt. #1).  Respondent has answered

19   the petition and filed the relevant state court records.  Thus, the case is ripe for review and a decision by

20   the court.

21                            FACTUAL AND PROCEDURAL HISTORY

22        Petitioner was found guilty of murder in the first degree and assault in the second degree on July

23   31, 1997, in Clark County Superior Court following a trial by jury. Respondent's Submission of Relevant

24   State Court Record with Regard to Petition for Writ of *Habeas Corpus* ("Record"), Exhibit 1, p. 1.  He

25   was sentenced to a prison term of 407 months on the murder charge and 74 months on the assault charge,

26   both terms to run concurrently.  Id. at p. 5.  The Washington State Court of Appeals summarized the facts

27   of petitioner's case in relevant part as follows:

28        Ramseyer shot and killed Richard Beckstead in the early morning of February 2,

1997. Beckstead had been sleeping with Loretta Ramseyer, Ramseyer's recently divorced ex-wife, at her house. Ramseyer entered the bedroom armed with a shotgun and confronted Beckstead and Mrs. Ramseyer. Prior to entering her home, Ramseyer had disconnected the telephone lines.

Beckstead had a pistol under the mattress. While Ramseyer and Beckstead exchanged words, Beckstead retrieved the pistol. According to the police, Ramseyer admitted that Beckstead simply kept the gun in his lap. According to Mrs. Ramseyer, Beckstead pointed the weapon at Ramseyer. Ramseyer aimed the shotgun and fired twice, wounding Beckstead in the face and arm. Ramseyer reloaded the gun and fired a third shot, mortally wounding Beckstead.

After shooting Beckstead, Ramseyer rolled him by the ankle off of the bed onto the floor. He told Mrs. Ramseyer not to call the police "for at least an hour" and took her cellular phone. He stayed in the house for ten to fifteen minutes and told Mrs. Ramseyer that he wanted to have sexual intercourse with her "one last time." She told him no. Aware that Beckstead was slowly dying in the bedroom, Ramseyer stated something to the effect of: "[I] can't believe he['s not] dead yet."

When Ramseyer left, Mrs. Ramseyer retrieved the cellular phone called the police, who found Beckstead breathing but unconscious. Beckstead later died from the shotgun wounds.

After a jury returned a verdict, the trial court imposed an exceptional sentence of 540 months (45 years). Ramseyer's standard range was 357 to 443 months.

Record, Exhibit 2, pp. 1-2.

Petitioner appealed his conviction. The Washington State Court of Appeals affirmed petitioner's conviction, but reversed the exceptional sentence and remanded the case for re-sentencing within the standard range. Id. at p. 12. Petitioner appealed the court of appeals' decision. The Washington State Supreme Court, however, denied his petition for review, and the court of appeals issued its mandate on December 7, 1999. Id., Exhibits 12-13.

On remand, petitioner was re-sentenced to a high-end standard range sentence of 407 months. Id., Exhibit 42, p. 2, Exhibit 71, p. 41. Petitioner appealed the trial court's re-sentencing and again challenged the legality of his conviction. The Washington State Court of Appeals affirmed both the re-sentencing and the conviction. Id., Exhibit 42. Petitioner appealed that decision. The Washington State Supreme Court denied petitioner's petition for review, and the court of appeals issued its mandate on November 4, 2002. Id., Exhibits 46-47.

Petitioner also has filed various other motions and petitions with the state courts. On December 2, 1999, he filed a motion with the Clark County Superior Court to compel production of certain statements he made to the police following his arrest. Id., Exhibit 14. That motion was denied by the superior court. Id., Exhibit 15. Both the Washington State Court of Appeals and the Washington State Supreme Court denied petitioner's motions for discretionary review. Id., Exhibits 20, 22, 24. The court of appeals issued

1  its mandate on October 1, 2002. <u>Id.</u>, Exhibit 27.

2      On July 17, 2001, petitioner filed a notice of appeal of the trial court's denial of his motion for a

3  new trial. <u>Id.</u>, Exhibit 48.  The Washington State Court of Appeals affirmed that denial, and denied his

4  motion for reconsideration. <u>Id.</u>, Exhibits 53, 55.  The Washington State Supreme Court denied his petition

5  for review, and the court of appeals issued its mandate on December 9, 2003. <u>Id.</u>, Exhibits 57-58.

6      In addition, while petitioner's appeal of the denial of his motion to compel discovery was pending,

7  he filed a personal restraint petition with the Washington State Court of Appeals, challenging the validity

8  of his conviction on the ground of ineffective assistance of counsel. <u>Id.</u>, Exhibit 28.  The court of appeals

9  denied the petition, and the Washington State Supreme Court denied petitioner's motion for discretionary

10  review. <u>Id.</u>, Exhibits 31, 33, 35.  The court of appeals issued its certificate of finality on May 12, 2002. <u>Id.</u>,

11  Exhibit 36.

12      On April 30, 2003, petitioner filed a motion for new trial and/or an evidentiary hearing with the

13  Clark County Superior Court. <u>Id.</u>, Exhibit 59.  The superior court transferred petitioner's motion to the

14  Washington State Court of Appeals as a personal restraint petition, which the court of appeals dismissed.

15  <u>Id.</u>, Exhibits 63-64.  The Washington State Supreme Court denied petitioner's motion for discretionary

16  review, and the court of appeals issued its certificate of finality on June 18, 2004. <u>Id.</u>, Exhibits 66, 68-69.

17      Here, petitioner challenges the legality of his conviction, presenting the following grounds for

18  federal *habeas corpus* relief:

19      (1)   His conviction was obtained in violation of the privilege against
20            self-incrimination guaranteed by the Fifth Amendment to the United States
              Constitution;

21      (2)   His conviction was obtained by a coerced confession, where the police did not
22            accurately convey his material statements into police reports violating his rights
              under the Fifth Amendment;

23      (3)   His conviction was obtained in violation of due process and the 14th Amendment
24            to the United States Constitution, when the state courts held that pre-trial
              stipulated facts were not binding on the state at trial;

25      (4)   His conviction was obtained in violation of due process and the 14th
26            Amendment, when the state knowingly used perjured testimony to prove the
              absence of self-defense; and

27      (5)   He was deprived of effective assistance of counsel under the 6th Amendment to
28            the United States Constitution, when defense counsel joined the state's effort to
              obtain his conviction.

REPORT AND RECOMMENDATION
Page - 3

1    Petition, at pp. 8-10.

2         There appears to be no issue of timeliness concerning petitioner's federal *habeas corpus* petition,

3    and respondent agrees petitioner has exhausted his state remedies.  Therefore, after carefully reviewing

4    petitioner's petition, respondent's answer and the remaining record, the undersigned recommends that the

5    Court deny the petition for the reasons set forth below.

6                                   <u>NO EVIDENTIARY HEARING IS REQUIRED</u>

7         In a proceeding instituted by the filing of a federal *habeas corpus* petition by a person in custody

8    pursuant to a judgment of a state court, the "determination of a factual issue" made by that court "shall be

9    presumed to be correct." 28 U.S.C. § 2254(e)(1).  Under 28 U.S.C. § 2254(e)(1), the petitioner has "the

10   burden of rebutting the presumption of correctness by clear and convincing evidence." <u>Id.</u>

11        Where a petitioner "has diligently sought to develop the factual basis of a claim for habeas relief,

12   but has been denied the opportunity to do so by the state court," an evidentiary hearing in federal court will

13   not be precluded. <u>Baja v. Ducharme</u>, 187 F.3d 1075, 1078-79 (9th Cir. 1999) (quoting <u>Cardwell v. Greene</u>,

14   152 F.3d 331, 337 (4th Cir. 1998)).  On the other hand, if the petitioner fails to develop "the factual basis of

15   a claim" in the state court proceedings, an evidentiary hearing on that claim shall not be held, unless the

16   petitioner shows:

17        (A) the claim relies on--

18             (i) a new rule of constitutional law, made retroactive to cases on collateral review by
               the Supreme Court, that was previously unavailable; or
19
               (ii) a factual predicate that could not have been previously discovered through the
20             exercise of due diligence; and

21        (B) the facts underlying the claim would be sufficient to establish by clear and
          convincing evidence that but for constitutional error, no reasonable factfinder would
22        have found the applicant guilty of the underlying offense

23   28 U.S.C. § 2254(e)(2).

24        An evidentiary hearing "is required when the petitioner's allegations, *if proven*, would establish the

25   right to relief." <u>Totten v. Merkle</u>, 137 F.3d 1172, 1176 (9th Cir. 1998) (emphasis added).  It "is *not*

26   required on issues that can be resolved by reference to the state court record." <u>Id.</u> (emphasis in original).

27   As the Ninth Circuit has stated, "[i]t is axiomatic that when issues can be resolved with reference to the

28   state court record, an evidentiary hearing becomes nothing more than a futile exercise." <u>Id.</u>; <u>United States</u>

REPORT AND RECOMMENDATION
Page - 4

1   v. Birtle, 792 F.2d 846, 849 (9th Cir. 1986) (evidentiary hearing not required if motion, files and records of

2   case conclusively show petitioner is entitled to no relief) (quoting 28 U.S.C. § 2255).

3        Petitioner argues an evidentiary hearing is required here.  However, "[t]here is no indication from

4   the arguments presented" by petitioner, "that an evidentiary hearing would in any way shed new light on

5   the" grounds for federal *habeas corpus* relief raised in his petition. Totten, 137 F.2d at 1177.  Because, as

6   discussed below, the issues raised by petitioner may be resolved based solely on the state court record and

7   he has failed to prove his allegation of constitutional errors, no evidentiary hearing is required.

8                                         DISCUSSION

9   I.        Standard of Review

10       A federal petition for writ of *habeas corpus* filed on behalf of a person in custody pursuant to a

11   judgment of a state court:

12        [S]hall not be granted with respect to any claim that was adjudicated on the merits in
          State court proceedings unless the adjudication of the claim--
13

14             (1) resulted in a decision that was contrary to, or involved an unreasonable
               application of, clearly established Federal law, as determined by the Supreme Court
               of the United States; or
15

16             (2) resulted in a decision that was based on an unreasonable determination of the
               facts in light of the evidence presented in the State court proceeding.

17   28 U.S.C. § 2254(d).  Thus, 28 U.S.C. § 2254(d) "defines two categories of cases" where such relief may

18   be obtained. Williams v. Taylor, 529 U.S. 362, 404 (2000).

19       Under 28 U.S.C. § 2254(d)(1), a state court decision is "contrary to" the Supreme Court's "clearly

20   established precedent if the state court applies a rule that contradicts the governing law set forth" in the

21   Supreme Court's cases. Lockyer v. Andrade, 538 U.S. 63, 73 (2003) (quoting Williams, 529 U.S. at 405-

22   06).  A state court decision also is contrary to the Supreme Court's clearly established precedent "if the

23   state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme

24   Court, "and nevertheless arrives at a result different from" that precedent. Id.

25       A state court decision can involve an "unreasonable application" of the Supreme Court's clearly

26   established precedent in the following two ways: (1) the state court "identifies the correct governing legal

27   rule" from the Supreme Court's cases, "but unreasonably applies it to the facts" of the petitioner's case; or

28   (2) the state court "unreasonably extends a legal principle" from the Supreme Court's precedent "to a new

1   context where it should not apply or unreasonably refuses to extend that principle to a new context where

2   it should apply." <u>Williams</u>, 529 U.S. at 407.  However, "[t]he 'unreasonable application' clause requires

3   the state court decision to be more than incorrect or erroneous." <u>Lockyer</u>, 538 U.S. at 75.  That is, "[t]he

4   state court's application of clearly established law must be objectively unreasonable." <u>Id.</u>

5          Under 28 U.S.C. § 2254(d)(2), a federal petition for writ of *habeas corpus* also may be granted "if

6   a material factual finding of the state court reflects 'an unreasonable determination of the facts in light of

7   the evidence presented in the State court proceeding.'" <u>Juan H. V. Allen</u>, --- F.3d ---, 2005 WL 1301570

8   n.8 (9th Cir. 2005) (quoting 28 U.S.C. § 2254(d)(2)).  In making this inquiry, however, the district court

9   "must presume that any state court factual finding is correct, and the petitioner has the burden of proving

10  otherwise by clear and convincing evidence." <u>Id.</u> (citing 28 U.S.C. § 2254(e)(1)).

11  II.     Scope of Review and Harmless Error

12         The district court may not "reexamine state-court determinations on state-law questions." <u>Estelle v.</u>

13  <u>McGuire</u>, 502 U.S. 62, 67-68 (1991).  Thus, the court "is limited to deciding whether a conviction violated

14  the Constitution, laws, or treaties of the United States." <u>Id.</u> at 68; <u>see also</u> <u>Smith v. Phillips</u>, 455 U.S. 209,

15  221 (1982) ("Federal courts hold no supervisory authority over state judicial proceedings and may

16  intervene only to correct wrongs of constitutional dimension.").  In addition, for federal *habeas corpus*

17  relief to be granted, the constitutional error must have had a "substantial and injurious effect or influence in

18  determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) (citation omitted).  In

19  other words, a petitioner is "not entitled to habeas relief based on trial error," unless he or she "can

20  establish that it resulted in 'actual prejudice.'" <u>Id.</u>

21  III.    The Suppression of Only the Taped Portion of Petitioner's February 6, 1999 Police Interview Did
        Not Violate His Fifth Amendment Right Against Self-Incrimination

22

23         The prohibition of the Fifth and Fourteenth Amendment "against compelled self-incrimination"

24  requires that "custodial interrogation be preceded by advice to the putative defendant that he has the right

    to remain silent and also the right to the presence of an attorney." <u>Edwards v. Arizona</u>, 451 U.S. 477, 481-
25
    82 (1981) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 479 (1966)).  Once the defendant "indicates in any
26
    manner, at any time prior to or during questioning" that he or she wishes to remain silent, however, "the
27
    interrogation must cease." <u>Miranda</u>, 384 U.S. at 473-74.  So too, if the defendant requests an attorney,
28
    "the interrogation must cease until an attorney is present." <u>Id.</u> at 474.

1    Similarly, if the defendant "indicates in any manner that he does not wish to be interrogated," he or

2    she may not be questioned by the police. Id. at 445.  Thus, the mere fact that the defendant "may have

3    answered some questions or volunteered some statements on his own does not deprive him of the right to

4    refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents

5    to be questioned," or "himself initiates further communication, exchanges or conversations with the

6    police." Id.; Edwards, 451 U.S. at 484-85.  As such, the defendant's "right to cut off questioning" must be

7    "scrupulously honored." Michigan v. Mosley, 423 U.S. 96, 104 (1975).

8    The defendant "may waive effectuation of these rights," provided, however, "the waiver is made

9    voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.  Waiver of counsel, therefore, "must

10   not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of

11   a known right or privilege." Edwards, 451 U.S. at 482.  This is an "objective inquiry" that "depends in

12   each case 'upon the particular facts and circumstances surrounding that case, including the background,

13   experience, and conduct of the accused." Id. (citations omitted); Davis v. United States, 512 U.S. 452, 459

14   (1994).  It "must be viewed in a totality of the circumstances." Arizona v. Fulminante, 499 U.S. 279, 285-

15   86 (1991) (citations omitted).

16   A defendant's invocation of the right to counsel "requires, at a minimum, some statement that can

17   reasonably be construed to be an expression of a desire for the assistance of an attorney." Davis, 512 U.S.

18   at 459 (citation omitted).  A defendant "who knowingly and voluntarily waives his right to counsel after

19   having that right explained to him has indicated his willingness to deal with the police unassisted." Id. at

20   460-61.  Any later request for an attorney "must be affirmatively invoked" by the defendant. Id. at 461.

21   The defendant, furthermore, "must unambiguously request counsel." Id. at 459.  The defendant

22   "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the

23   circumstances would understand the statement to be a request for an attorney." Id.  Therefore, if a

24   defendant's statement "fails to meet the requisite level of clarity," the police are not required to stop their

25   questioning, nor are they required to ask "clarifying questions." Id. at 459, 461.

26   Here, petitioner alleges that the state trial court violated his Fifth Amendment right against self-

27   incrimination by suppressing only the taped portion of his February 6, 1999 police interview, while

28   admitting into evidence statements made during the non-taped portion.  On June 24, 1997, the trial court

held a pre-trial hearing pursuant to Washington Superior Court Criminal Rule ("CrR") 3.5,[1] to determine

the admissibility of certain statements plaintiff made during three separate police interviews conducted on

February 3, 6 and 9, 1997, respectively. Record, Exhibit 70.  Respondent has succinctly summarized the

testimony of the detectives who interviewed petitioner on February 6 as follows:

> Detective Harper testified that the [sic] Mr. Ramseyer initiated contact with him
> on February 6; that he was read his <u>Miranda</u> warnings; that Mr. Ramseyer waived his
> Miranda rights and agreed to speak to the officers. [Record, Exhibit 70] at 47-49.  After
> conducting a portion of a non-tape-recorded interview, Detective Harper asked Mr.
> Ramseyer for permission to conduct a tape-recorded interview.  According to Detective
> Harper's testimony, Mr. Ramseyer responded, "I'd rather have my attorney for that
> one." <u>Id.</u> at 57-58.  This occurred approximately twenty or thirty minutes, or one-third
> of the way through the oral interview. <u>Id.</u> at 60.  At the end of the non-taped interview,
> Detective Harper again asked if Mr. Ramseyer was willing to give a taped statement.
> Mr. Ramseyer agreed, so long as the detectives stayed away from certain subjects. <u>Id.</u>
> At that time, Mr. Ramseyer did not request to talk with an attorney. <u>Id.</u> at 61-62.
> Detective Harper testified that he again read Mr. Ramseyer the <u>Miranda</u> right, which Mr.
> Ramseyer waived.  Mr. Ramseyer agreed to answer questions in a tape-recorded
> session. <u>Id.</u> at 61-62.
> Detective Downey testified that Mr. Ramseyer, when first asked about a
> tape-recorded interview, responded by saying that he'd have to talk to his attorney about
> that one. <u>Id.</u> at 68.  Detective Downey testified that Mr. Ramseyer later agreed to allow
> a tape-recorded interview, stating "he'd answer our questions and that if there was a
> question that was asked that he didn't want to answer, he would just let us know." <u>Id.</u>
> Detective Downey testified that she witnessed Mr. Ramseyer being given <u>Miranda</u>
> warnings prior to the taped interview and Mr. Ramseyer waiving his rights. <u>Id.</u> at 69.

Answer, pp. 21-22.  Petitioner did not testify at the hearing.

The state trial court determined in relevant part: (1) petitioner initiated contact with the detectives

investigating the case; (2) petitioner admitted initiating such contact; (3) petitioner waived his <u>Miranda</u>

rights and agreed to speak with the detectives; (4) petitioner made no request to contact his attorney at

that point; (5) petitioner made a request to speak to his counsel that was limited to the tape recorded

portion of the interview; and (6) although the untaped portion of the interview was admissible, the taped

portion of the interview was inadmissible. Record, Exhibit 8, at attached Exhibit B, pp. 2-3.  The

Washington State Court of Appeals upheld the trial court's determination, finding in relevant part as

follows:

> Ramseyer evinced a desire to continue answering questions that he thought he could
> answer without having an attorney present. His statement, "I'd rather have an attorney
> for that one," was not an unambiguous request for counsel. The trial court did not err in
> allowing the non-taped portion of the interview.

---

[1]In Washington, a trial court conducts a CrR 3.5 hearing "to determine the admissibility of involuntary, incriminating statements." <u>State v. Reid</u>, 98 Wn.App. 152, 163 (1999).

1    Id., Exhibit 2, p. 7.

2        Petitioner argues he unequivocally requested his attorney to be present during the entire February 6

3    interview, and not just the taped recorded portion.  First, petitioner asserts his only purpose in initiating the

4    interview that day was to talk about his present situation and conditions of confinement, not about the past

5    or the crime that was committed.  He further asserts that Detective Harper overcame his will to not talk

6    about the past, and that he was not capable of dealing with the police detectives without his attorney,

7    except to obtain answers to questions he had regarding his current status.

8        It is quite clear from Detective Downey's report of the February 6, 1997 interview, however, that

9    petitioner was willing to answer questions regarding the crime in question.  For example, after asking the

10   detectives a number of questions regarding his present situation and conditions of confinement, petitioner

11   asked the detectives if they had any questions for him. Petition, Exhibit AA-2, p. 1-2.  The detectives then

12   began asking petitioner a series of questions regarding the crime that had occurred, for which he provided

13   answers. Id. at pp. 2-3.  There is no indication at that point in time that he had expressed an inability or

14   desire not to answer any of the detectives' questions.  Thus, the state trial court properly found his answers

15   during the February 6, 1997 interview to be coherent. Record, Exhibit 8, at attached Exhibit B, p. 3.

16       Petitioner next asserts that when he stated "I'd rather have my attorney for that one" in response to

17   Detective Harper's question as to whether he would be willing to do another taped statement regarding

18   their conversation that day, he was making an unequivocal request to have his counsel present during the

19   entire conversation, not just the taped portion.  However, the transcript from the July 24, 1997, CrR 3.5

20   hearing, as summarized above, clearly indicates otherwise, as does Detective Downey's report. Petition,

21   Exhibit AA-2, p. 3.  Taken in context, it is clear Detective Harper and petitioner were both referring only

22   to the taped portion of the February 6, 1997 interview.

23       Petitioner further asserts that by attempting to clarify facts about the crime after he requested the

24   presence of his counsel, Detective Harper violated his Fifth Amendment right against self-incrimination.

25   As discussed above, however, petitioner evinced a desire to have his counsel present only for any portion

26   of the interview that would be taped, and previously had shown a willingness to answer the detectives'

27   questions regarding the crime that had occurred.  Thus, it was reasonable for the detectives, considering

28   the totality of the circumstances, to assume that petitioner was willing to answer their questions without

     the presence of counsel as long as the interview was not taped.

REPORT AND RECOMMENDATION
Page - 9

1    As such, petitioner has not shown that the state courts' decisions on this issue were "contrary to, or

2    involved an unreasonable application of, clearly established federal law," or "based on an unreasonable

3    determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d).  In particular, he has

4    failed to meet his burden of rebutting "by clear and convincing evidence" the presumption that the state

5    trial court's factual finding regarding the voluntariness and scope of his request for counsel was correct.

6    Juan H., --- F.3d ---, 2005 WL 1301570 n.8.

7    IV.    Petitioner's Allegation of the Use of Falsified Police Reports, Perjured Testimony, and Involuntary
           Statements to Obtain His Conviction in Violation of His Fifth and Fourteenth Amendment Rights
8          Are Unfounded

9    Plaintiff alleges the police detectives who interviewed him changed the actual statements he made

10   to them in their reports, committed perjury by testifying during the trial in accordance with the allegedly

11   falsified reports, and improperly withheld those reports and the search warrant affidavit from him.  These

12   allegations are all without merit.

13        A.      Access to Copies of Police Reports and Search Warrant Affidavit

14   The undersigned will address first petitioner's claim that the state actively kept from him for three

15   years copies of police reports and a search warrant affidavit that contained his allegedly false statements.

16   On December 2, 1999, petitioner brought a motion to compel production of copies of the statements he

17   gave to the police on February 3, 6 and 15, 1997. Record, Exhibit 14, p. 1.  The Clark County Superior

18   Court denied that motion. Id., Exhibit 15.  The Washington State Court of Appeals affirmed the trial

19   court's denial, finding that petitioner was not entitled to discovery under the state's discovery rules and had

20   not shown good cause to believe the discovery would prove entitlement to relief. Id., Exhibit 20, pp. 1-2.

21   The court of appeals' decision was affirmed by the Washington State Supreme Court on September 4,

22   2002. Id., Exhibits 24, 26.

23   Petitioner, however, has not shown how these judicial decisions demonstrate an active attempt to

24   keep from him discovery materials to which he was entitled.  Indeed, those decisions indicate that he was

25   not entitled to such discovery.  Petitioner further argues that he was unaware of the allegedly inaccurate

26   statements attributed to him in the police reports until he finally received copies of them sometime in 2002.

27   Although he may not have obtained those documents until sometime in 2002, petitioner does not allege he

28   was unaware of their existence prior thereto, nor does he show he made any attempt to obtain those

     reports earlier.  Indeed, it appears petitioner was able to obtain copies of those reports, as well as a copy of

the police search warrant affidavit (albeit an unsigned one) on his own by making a state Public Disclosure

Act request. Petition, Exhibit CC-1.  As noted by the court of appeals in denying petitioner's second

personal restraint petition:

> Although it appears that petitioner just recently obtained copies of these
> documents, he does not allege that he was unaware of their existence when he
> previously raised these issues.

> Moreover, there is no apparent reason why he did not previously assert that his
> custodial statements or the warrant-related documents would have supported his
> arguments.  On the contrary, it appears that the pretrial stipulated facts were based on
> these same documents.  Thus, it is clear that these documents were known to petitioner
> at the time of trial.  Petitioner had ample opportunity to support his prior arguments
> with this information, and his failure to do so does not justify reexamination of these
> issues now.

Record, Exhibit 64, pp. 7-8.  Thus, the record simply does not support petitioner's allegation that the state

actively prevented him from getting access to the police reports and search warrant affidavit.

   B.   <u>Voluntariness of Plaintiff's Statements to the Police</u>

   Petitioner next argues he did not voluntarily make the statements attributed to him in the police

reports.  Thus, he asserts, the state's use of those statements violated his Fifth Amendment right against

self-incrimination.  As discussed above, the Clark County Superior Court held a CrR 3.5 hearing prior to

trial to determine the admissibility of the police report statements.  Petitioner had the opportunity to testify

at that hearing, but did not do so.  The police detectives who interviewed him on the dates in question did

testify.  Based on their testimony, the trial court found that, with the exception of the taped portion of the

February 6, 1997 interview, petitioner's statements were voluntarily, knowingly and intelligently made, and

therefore were admissible. <u>Id.</u>, Exhibit 8, at attached Exhibit B.

   To support his argument that these statements were not voluntarily, petitioner cites to <u>Jackson v.</u>

<u>Denno</u>, 378 U.S. 368 (1964).  In <u>Jackson</u>, the Supreme Court found that the procedure used by the state of

New York "did not afford a reliable determination of the voluntariness of the confession" that was offered

into evidence at the accused's trial. <u>Id.</u> at 377.  In New York at that time, the trial court was required to

exclude a confession "if in no circumstances" it could be deemed voluntary. <u>Id.</u>  On the other hand, if the

evidence presented a "fair question" as to the confession's voluntariness, the trial court was to leave to the

jury "the ultimate determination of its voluntary character" and truthfulness. <u>Id.</u>

   New York's procedure thus is wholly different from that used in Washington, and by the trial court

in this case, which requires that "[w]hen a statement of the accused is to be offered in evidence," a hearing

REPORT AND RECOMMENDATION
Page - 11

is to be held prior to trial to determine if the statement is admissible. CrR 3.5(a).  Indeed, in <u>Jackson</u>, the Supreme Court clearly distinguished New York from those states, such as Washington, where "the judge himself solely and finally determines the voluntariness of the confession." <u>Jackson</u>, 378 U.S. at 378.  This is because in the latter case, the trial court's "conclusions are clearly evident from the record." <u>Id.</u> at 378-79. That is, the trial court "either admits the confession into evidence if it is voluntary or rejects it if it is involuntary." <u>Id.</u> at 379.  This is exactly the procedure the trial court followed in this case.

Petitioner also claims he was not allowed to read, sign or approve the statements contained in the police reports, and, as such, are not his own statements within the meaning of Federal Rule of Evidence ("Fed. R. Evid.") 801(d)(2)(A).  That is, petitioner asserts the statements contained in those reports were not voluntarily made by him. Fed. R. Evid. 801(d)(2)(A) provides that a statement is not hearsay if it is offered against a party and is that party's own statement.  Thus, under Fed. R. Evid. 801(d)(2)(A), "an admission offered by a party is not hearsay at all, and is therefore admissible against that party." <u>Totten</u>, 137 F.3d at 1176.  In addition, there is no requirement that a party read, sign or approve such a statement before it may be admitted against that party.

Petitioner cites to the decisions by the Ninth Circuit Court of Appeals in <u>Martinez v. Estelle</u>, 612 F.2d 173 (5th Cir. 1980), and <u>United States v. Felix-Jerez</u>, 667 F.2d 1297 (9th Cir. 1982) to support this allegation.  Neither of these cases, however, constitute clearly established precedent of the Supreme Court. <u>See</u> <u>Lockyer</u>, 538 U.S. at 73.  Regardless, both cases are distinguishable from this case.  In <u>Martinez</u>, the Fifth Circuit found that the method used by the Texas state trial court to determine the voluntariness of the accused's confession suffered from the same constitutional deficiencies the Supreme Court found the New York procedure did in <u>Jackson</u>. <u>Martinez</u>, 612 F.2d at 176-80.

In <u>Felix-Jerez</u>, the Ninth Circuit noted that because the defendant had never read, seen or signed a written confession prepared by an interpreter used by investigating authorities, the question was whether that confession could be his "own" statement within the meaning of Fed. R. Evid. 801(d)(2)(A). <u>Felix-Jerez</u>, 667 F.2d at 1299.  In that case, the defendant did not even know of the confession's existence until the beginning of his trial, nor did the defendant testify at his trial. <u>Id.</u>  Here, however, a pretrial hearing on the voluntariness of the statements petitioner made to the police (at which petitioner was present and had the opportunity to testify), petitioner has made no showing that he was unaware of the existence of these statements prior to his trial, and petitioner in fact testified at trial.

REPORT AND RECOMMENDATION
Page - 12

Petitioner, therefore, has failed to show the state courts' decisions on the issue of the voluntariness of his statements to the police were either "contrary to, or involved an unreasonable application of, clearly established federal law," or "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d).

C.     Trustworthiness of Petitioner's Statements

Petitioner raises for the first time in his supplemental memorandum of law in support of his writ of *habeas corpus* (Dkt. #43-2, p. 10) the issue of whether the state was required to, and the extent to which it did, provide independent evidence to corroborate the trustworthiness of the statements attributed to him in the police reports.  As such, it appears petitioner has not exhausted this issue in state court.  Exhaustion of state court remedies is a prerequisite to the granting of a petition for writ of *habeas corpus*, and it must be waived explicitly by respondent.  28 U.S.C. § 2254(b)(1), (3).

A petition can satisfy the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider all claims before presenting those claims to the federal court.  Picard v. Connor, 404 U.S. 270, 276 (1971); Middleton v. Cupp, 768 F.2d 1083, 1086 (9th Cir. 1985).  Full and fair presentation of claims to the state court requires "full factual development" of the claims in that forum. Kenney v. Tamayo-Reyes, 504 U.S. 1, 8 (1992).  It is not enough, however, that all of the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state law claim was made.  Duncan v. Henry, 513 U.S. 364, 366 (1995) (citing Picard v. Connor, 404 U.S. 270 (1971) and Anderson v. Harless, 459 U.S. 4 (1982)).

A federal claim is "fairly and fully" presented to the state courts if the claim is presented "(1) to the proper forum, (2) through the proper vehicle, and (3) by providing the proper factual and legal basis for the claim." Insyxiengmay v. Morgan, 403 F.3d 657, 668 (9th Cir. 2005) (internal citations omitted).  The petitioner "must alert the state courts to the fact that he is asserting a federal claim in order to fairly and fully present the legal basis of the claim." Id.

The claim must be fairly presented in "each appropriate state court," that is, at each level of state review, so as to alert the state "to the federal nature of the claim," and to give it the "opportunity to pass upon and correct" alleged violations of the petitioner's federal rights. Baldwin v. Reese, 541 U.S. 27, 29 (2004) (citations and internal quotation marks omitted); see also Ortberg v. Moody, 961 F.2d 135, 138 (9th Cir. 1992).  The federal basis of the claim, furthermore, must be made "explicit" in the state appeal or

1  petition, "either by specifying particular provisions of the federal Constitution or statutes, or by citing to

2  federal case law." Insyxiengmay, 403 F.3d at 668; Baldwin, 541 U.S. at 33.

3       It was not until after respondent filed his answer to petitioner's federal *habeas corpus* petition that

4  petitioner raised the issue of his statements' trustworthiness, citing to Opper v. United States, 348 U.S. 84

5  (1954), and United States v. Lopez-Alvarez, 970 F.2d 583 (9th Cir. 1992).  While petitioner did discuss

6  briefly the issue of the accuracy of those statements in state court, that discussion was made solely within

7  the context of his allegation that the statements were involuntary.  Indeed, petitioner made no mention of

8  Opper, Lopez-Alvarez or other case law concerning the issue of trustworthiness.  He also did not raise this

9  issue until he filed in the Washington State Supreme Court a motion for discretionary review of the denial

10 of his second personal restraint petition. Record, Exhibit 65, p. 13, Exhibit 67, p. 17.

11      Even if petitioner could be said to have exhausted this issue, furthermore, the undersigned finds the

12 state met the requisite level of corroboration in this case.  The general rule is that "an accused my not be

13 convicted on his own uncorroborated confession." Smith v. United States, 348 U.S. 147, 152 (1954).  A

14 defendant's "admissions of essential facts or elements of the crime, subsequent to the crime, are of the

15 same character as confessions," and thus also "must be corroborated." Opper, 348 U.S. 84 at 90-91.  At its

16 inception, the above "corroboration rule" required that:

17      In order to convict of serious crimes of violence, then capital offenses, independent
        proof was required that someone had indeed inflicted the violence, the so-called corpus
18      delicti.  Once the existence of the crime was established, however, the guilt of the
        accused could be based on his own otherwise uncorroborated confession.
19

20 Smith, 348 U.S. at 153-54.  However, for crimes where there is "no tangible injury," it "cannot be shown

21 that the crime has been committed without identifying the accused." Id. at 154.  Accordingly, with respect

22 to *those* types of crimes, "corroborative evidence" is required to "implicate the accused." Id.

23      Nine years later, the Supreme Court again succinctly set forth the appropriate standard:

24      Where the crime involves physical damage to a person or property, the prosecution must
        generally show that the injury for which the accused confesses responsibility did in fact
25      occur, and that some person was criminally culpable.  A notable example is the principle
        that an admission of homicide must be corroborated by tangible evidence of the death of
26      the supposed victim.  There need in such a case be no link, outside the confession,
        between the injury and the accused who admits having inflicted it.  But where the crime
27      involves no tangible corpus delicti, we have said that 'the corroborative evidence must
        implicate the accused in order to show that a crime has been committed.'

28 Wong Sun v. United States, 371 U.S. 471, 489 n.15 (1963) (quoting Smith, 348 U.S. at 154) (internal

citation omitted).

REPORT AND RECOMMENDATION
Page - 14

Here, the crime for which petitioner was convicted involved physical damage to a person, namely the homicide of Mr. Beckstead.  As such, the state trial court's decision to admit the statements petitioner made to the police was not "contrary to, or involved an unreasonable application of, clearly established federal law." 28 U.S.C. § 2254(d).  It is true that the Ninth Circuit in Lopez-Alvarez read the decisions in Opper and Wong Sun to require that the state "introduce independent evidence tending to establish the trustworthiness of the admissions, unless the confession is, by virtue of special circumstances inherently reliable," even in cases, such as this one, where there is a tangible *corpus delicti*. Lopez-Alvarez, 970 F.2d at 592.  Petitioner's reliance on Lopez-Alvarez is misplaced, however, as it does not constitute a clearly established precedent of the Supreme Court. See Lockyer, 538 U.S. at 73.

In any event, even under the standard enunciated by the Ninth Circuit in Lopez-Alvarez, the state both showed "the criminal conduct at the core of the offense" had occurred, and introduced "independent evidence tending to establish the trustworthiness" of petitioner's admissions. Lopez-Alvarez, 970 F.2d at 592.  Petitioner contends that police detectives falsified the statements attributed to him in their reports, and, as such, are not the actual statements he provided.  Essentially, petitioner is asserting that his version of the events are true, and that everyone else is lying, as noted by the Washington State Court of Appeals in affirming his conviction:

> Ramseyer essentially attempts to retry his case on appeal by urging that his version of the events is true and everyone else was lying.  Credibility determinations are for the trier of fact and are not subject to review. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).  This court must defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Walton*, 64 Wn. App. 410, 415-16, 824 P.2d 533, *review denied*, 119 Wn.2d 1011(1992).  The jury was entitled to believe the other witnesses and not Ramseyer.

Record, Exhibit 2, p. 9.

At trial, the state showed through witness testimony and forensic and other physical evidence that petitioner was the one who shot and killed Mr. Beckstead.  In addition, petitioner himself testified at trial and provided his version of what happened.  As such, there was ample independent evidence to establish the trustworthiness of petitioner's admissions.  As the court of appeals noted above, it was the jury's duty to determine the credibility of the witnesses who testified, including petitioner, and the persuasiveness of the evidence presented.  Accordingly, the jury was entitled to find petitioner less credible than the other witnesses.  Petitioner therefore has not shown that the admission of his statements was either "contrary to, or involved an unreasonable application of, clearly established federal law," or "based on an unreasonable

1    determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d).

2          D.     <u>Falsification of Police Reports and Perjured Testimony</u>

3        Lastly, petitioner alleges that the police detectives who interviewed him did not accurately convey

4 the statements he made to them in their reports, and that these falsified statements were then used against

5 him to obtain a conviction in violation of his Fifth and Fourteenth Amendment rights.  Petitioner further

6 alleges the police detectives perjured themselves by providing testimony at trial that conflicted with the

7 statements he actually made to them.  These allegations lack merit as well.

8        In denying petitioner's second personal restraint petition, the Washington State Court of Appeals

9 addressed petitioner's allegation of perjured testimony:

10        Mr. Ramseyer claims that, on the issue of when Mr. Beckstead first pointed his
pistol, the detectives' trial testimony is at odds with the report of their interview with
Mr. Ramseyer.  But there is no conflict.  At trial, Detectives Downey and Harper both
11 testified that they recalled Mr. Ramseyer saying that Mr. Beckstead did not point his
pistol until after Mr. Ramseyer fired two "warning" shots over Mr. Beckstead's head.
12 This is completely consistent with Detective Downey's report.  She stated:

13        I asked if Rick [Beckstead] had his gun pointed at him the whole time.
14    Ramseyer said, "No."  He said that Rick started to raise the gun.  He
said, "I told him to drop the gun."  I then asked where the gun was when
15 he fired the two warning shots.  Ramseyer said, "On his lap, but I shot
above his head."  I then asked if Rick was pointing the gun at him.  He
16 said, "No, and I not pointing at him.  I just want to make my point clear."
I then asked when Rick pointed the gun.  He said, "Between shots two
17 and three … ".

18        … I asked where the gun was fired when he fired his warning shots.  He
said the barrel was pointing down the bed.  I asked if it was pointed at
19 him.  He said it was not pointed at him.

20 Motion and Supporting Memorandum of Law for Evidentiary Hearing and/or New Trial
Pursuant to CrR 7.8(b), Exh. AA-2 at 7.
21

22        The police reports therefore do not demonstrate perjury.  The facts related in the
search warrant affidavit (prepared by Detective Harper) do not perfectly track those in
23 the reports, but, again, the affidavit does not show that the detectives knowingly gave
false testimony at trial.  Since the "new" evidence would not probably affect the
outcome of the trial, it does not qualify as newly discovered evidence for purposes of a
24 new trial.

25 Record, Exhibit 66, pp. 2-3.  Petitioner does not argue the state courts' decision on this issue was either

26 "contrary to, or involved an unreasonable application of, clearly established federal law," or "based on an

27 unreasonable determination of the facts in light of the evidence presented."  28 U.S.C. § 2254(d).  Rather,

28 he simply re-states the allegations he made below in the state courts.

       The record, furthermore, supports the court of appeals' findings.  The detectives' testimony was

largely consistent with the report Detective Downey wrote concerning the February 6, 1997 interview. Record, Exhibit 71, pp. 504, 507, 516-17, 522-23, 527; Petition, Exhibit AA-2, pp. 7-8.  In addition, any inconsistencies in the statements attributed to petitioner in the police interviews were at least as likely to have been due to inconsistencies in petitioner's own statements than to perjury on the part of either police detective.  See, e.g., Petition, Exhibit AA-1, p. 7, Exhibit AA-3, p. 2.  In any event, there simply is nothing in the record currently before this court to show that the detectives knowingly gave false testimony at trial or falsified the statements attributed to petitioner in their police reports.

Petitioner argues, however, that he made an "offer of proof" that the police detectives in general do not accurately convey statements into the reports they write.  To support this contention, petitioner alleges Detective Harper inaccurately portrayed statements petitioner's children and ex-wife made after the trial regarding the events that occurred the day that Mr. Beckstead was killed.  As discussed above, petitioner is essentially attempting to retry his case by urging that his version of the events are true and everyone else was lying.  In affirming the denial of petitioner's motion for a new trial based on such "newly discovered evidence," the Washington Court of Appeals stated:

> In deciding whether to grant a new trial based on newly discovered evidence or recantation of trial testimony, the trial judge, not the jury, must first assess the credibility and reliability of the proffered testimony. *State v. West*, 139 Wn.2d 37, 43, 50, 983 P.2d 617 (1999).  Ramseyer argues that the trial court did not make this assessment and thus, erred in denying his motion for a new trial.  We disagree.

> In ruling on Ramseyer's motion, the trial court observed:

> > The court must independently examine recantation evidence for credibility, before granting a new trial thereon.  It is quite clear to me that, based upon the trial testimony, the affidavit and interrogatory of Loretta [Thomas] [formerly Ramseyer], and her subsequent interview by Det. Harper, that her post trial statements carry little or no weight, and would not change the result of Defendant's trial.

> CP at 218-19.  Here, the record supports the trial court's ruling that the recantation was not sufficient to provide the basis for a new trial.  The ruling indicates that the trial court performed a proper evaluation of the testimony, taking applicable case law into account in reaching its conclusion.

Record, Exhibit 53, p. 5.  Again, petitioner's re-assertion that such testimony supports his version of the events is insufficient to overcome the presumption that the state trial court's factual finding was correct on this issue.  Juan H., --- F.3d ---, 2005 WL 1301570 n.8.

V.   Petitioner's Fourteenth Amendment Due Process Rights Were Not Violated When the State Trial Court Allowed Testimony in Opposition to the Parties' Pre-Trial Set of Stipulated Facts

Prior to trial, defense counsel moved for a pre-trial ruling on whether the facts in the case would warrant a self-defense and/or heat-of-passion instruction to the jury. Petition, Exhibit JJ, Defendant's Pre-Trial Motion to Determine Jury Instruction of: (1) Self Defense; and (2) Heat of Passion.  In that motion defense counsel stated that it was "based upon the stipulated facts by State and defense." Id.  Attached to the motion itself was a document titled "Stipulated Facts Re: Pre-Trial Ruling On: (1) Self-Defense Jury Instruction; and (2) Heat-of-Passion Jury Instruction." Id.

Petitioner argues these "Stipulated Facts" were binding on the court and the parties for purposes of trial, and that, therefore, the state was prohibited from presenting any testimony that contradicted the facts contained in the pre-trial stipulation.  Petitioner's interpretation of the purpose of the "Stipulated Facts" is wholly without merit.  It is clear the parties agreed to that stipulation solely for the purpose of determining whether petitioner was entitled to present certain defenses at trial.  Thus, for example, the state trial court ruled prior to trial that:

> I want to make it clear for this record also that I've considered the stipulated facts on the issue of self-defense, and I've told both lawyers that it looks like if the defendant testifies consistently with the stipulated facts that he'd be entitled to a self-defense instruction, but the State would be entitled to a provocation instruction.

Record, Exhibit 70, p. 109.  Petitioner's argument, furthermore, has been repeatedly rejected by the state courts as being completely without merit and a misconstruction of the nature of the pre-trial stipulation. See Id., Exhibit 24, p. 2, Exhibit 31, p. 4, Exhibit 33, p. 3, Exhibit 42, p.7-8.  As explained by the state trial court during petitioner's sentencing hearing:

> Now, I'm going to address briefly this stipulated facts issue because it seems to be a very central point in your presentation.  You totally misconstrue the significance of the stipulated facts.  As I stated earlier, there was an issue of self-defense in this case. That claim was brought by the Defense.
> The Defense and the prosecution wanted the issue litigated before trial whether or not you'd even be entitled to claim self-defense.  Rather than going through a trial, hearing the jury -- or, the jury hearing about self-defense all through the trial and then me having to instruct the jury when it was time to deliberate that there was no evidence of self-defense, and therefore they can't consider it.
> So we heard the evidence in a light most favorable to the Defense through stipulated facts.  Now, I looked at the document. The stipulated facts were -- was a stipulation of what facts would be presented by the Defense on the issue of self-defense.
> It was not a stipulation as to what facts would be presented or argued by the prosecutor.  They're two completely different things, but you don't see that, you think that the stipulated facts was an admission by the prosecution, but in the context it came up, and that is determining whether or not there was sufficient Defense evidence to go to the jury on self-defense.  That's an untenable characterization.

Id., Exhibit 71, at 33-35.

1   Petitioner relies on two Supreme Court decisions, <u>Braxton v. United States</u>, 500 U.S. 344 (1991),

2   and <u>Dawson v. Delaware</u>, 503 U.S. 159 (1992), and a Ninth Circuit Court of Appeals decision, <u>United</u>

3   <u>States v. Shapiro</u>, 879 F.2d 468 (1989), to support his claim.  All of these decisions, however, are clearly

4   distinguishable from the case at hand, and thus are unhelpful to petitioner.

5   <u>Braxton</u> dealt with a stipulation the government and the defendant had entered into regarding the

6   facts of the crime alleged during a plea hearing, the purpose of which was to provide a factual basis for

7   accepting the defendant's guilty pleas. <u>Braxton</u>, 500 U.S. 345-46.  The district court then sentenced the

8   defendant to a more serious offense than which the stipulated facts showed he committed, even though the

9   sentencing guidelines provided that a higher sentence may be imposed only if the guilty plea contained a

10  stipulation specifically establishing the more serious offense. <u>Id.</u> at 346.  The Supreme Court merely held

11  that the actual stipulation did not comply with this requirement. <u>Id.</u> at 351.  Here, however, as discussed

12  above, the pre-trial stipulation was entered into solely for the purpose of determining whether petitioner

13  was entitled to certain defenses, and was not admitted at trial.

14  In <u>Dawson</u>, prior to the penalty phase of the trial, the government and the defendant entered into a

15  stipulation regarding certain facts concerning an organization known as the Aryan Brotherhood, of which

16  the defendant was a member. <u>Dawson</u>, 503 U.S. at 160, 162.  In return for that stipulation, the prosecution

17  agreed to not call any expert witnesses to testify about that organization. <u>Id.</u> at 162.  While the defendant

18  did agree to the stipulated facts so as to avoid presentation of such testimony, he objected to having the

19  stipulation admitted on the basis that it violated his First and Fourteenth Amendment rights. <u>Id.</u>  At the

20  hearing, the prosecution read the stipulation to the jury and introduced evidence regarding the defendant's

21  connection to the Aryan Brotherhood. <u>Id.</u>  The Supreme Court held the district court erred in admitting the

22  stipulation due to its lack of relevance to the defendant's sentencing. <u>Id.</u> at 165.  Here, again, the pre-trial

23  stipulation was for the very limited purpose of determining whether petitioner would be entitled to assert

24  certain defenses, and was not admitted at trial.

25  Finally, it is true that in <u>Shapiro</u>, the Ninth Circuit stated that it will "enforce agreements made by

26  prosecutors upon which defendants have justifiably relied to their detriment." <u>Shapiro</u>, 879 F.2d at 471.

27  Here, however, petitioner did not justifiably rely on the "Stipulated Facts" to his detriment.  By now, the

28  nature and purpose of those "Stipulated Facts" should be evidently clear to petitioner.  He could not have

justifiably believed the prosecution would be limited by those facts at trial.  Further, in <u>Shapiro</u>, although

the prosecution agreed to limit the manner in which it could introduce evidence of the defendant's prior criminal conviction, it proceeded to cross examine him regarding that conviction at trial, and the district court admitted it into evidence. Id. at 470.  Such is not the case here.

Accordingly, petitioner has failed to show that the state courts' determination that the "Stipulated Facts" was not binding on the trial court or parties for the purpose of trial was "contrary to, or involved an unreasonable application of, clearly established federal law," or "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d).

VI.    The State Did Not Knowingly Use Perjured Testimony to Convict Petitioner

Petitioner alleges the state violated his right to due process under the Fourteenth Amendment by knowingly using perjured testimony at trial to convict him.  Specifically, petitioner asserts this is shown by the fact that the state did not charge him with unlawful entry into his ex-wife's home, that the police detectives falsified their reports and perjured themselves at trial, that his ex-wife also committed perjury, and that the "Stipulated Facts" support his version of the events.

A conviction that is "obtained by the knowing use of perjured testimony is fundamentally unfair." United States v. Agurs, 427 U.S. 97, 103 (1976); Napue v. People of the State of Illinois, 360 U.S. 264, 269 (1959) ("[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.").  It "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Agurs, 427 U.S. at 103; United States v. Endicott, 869 F.2d 452, 455 (9th Cir. 1989) (conviction must be set aside if there is any reasonable likelihood false testimony could have affected jury verdict).  The same is true "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Napue, 360 U.S. at 269; Giglio v. United States, 405 U.S. 150, 153-54. (suppression of material evidence justifies new trial irrespective of good or bad faith of prosecution).

Plaintiff's allegations regarding the falsified police reports, the detectives' perjured testimony, and the "Stipulated Facts" previously have been addressed and, as discussed above, rejected.  That petitioner was not charged with unlawful entry by the state, when he already was being charged with the far more serious crimes of first degree murder and second degree assault, does not prove the state knew he had the right to be in his ex-wife's house.  Indeed, Mrs. Ramseyer testified and indicated to the police that he did not have that right. See Record, Exhibit 70, pp. 177-79, 232-33, 252-55; Petition, Exhibit A-2.

REPORT AND RECOMMENDATION
Page - 20

1    As for petitioner's claim that Mrs. Ramseyer also committed perjury, again the record reflects that

2    at most there was conflicting testimony from petitioner's son about when petitioner was going to arrive at

3    the house. Answer, Exhibit 70, pp. 177-79, 232-33, 252-55, 549-59; Petition, Exhibit A-2.  The state trial

4    court permitted such testimony for the limited purposes of impeaching Mrs. Ramseyer's credibility or

5    showing Mr. Beckstead's state of mind. Answer, Exhibit 70, pp. 549-557.  Thus, the trial court did not, as

6    petitioner claims, find that Mrs. Ramseyer's testimony was false or that she committed perjury.  Indeed, it

7    is quite clear from the pleadings petitioner filed with this court that he consistently misstates and distorts

8    the record in an effort to bolster his position.

9    Petitioner thus has failed to show that on this issue the state courts' decisions were "contrary to, or

10   involved an unreasonable application of, clearly established federal law," or "based on an unreasonable

11   determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d).

12   VII.   Petitioner's Sixth Amendment Right to Effective Assistance of Counsel Was Not Violated

13   The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to

14   effective assistance of counsel. Yarborough v. Gentry, 540 U.S. 1, 4 (2003); Strickland v. Washington,

15   466 U.S. 668, 686 (1984) (right to counsel is right to effective assistance of counsel).  When ineffective

16   assistance of counsel is claimed, the standard to be used is "whether counsel's conduct so undermined the

17   proper functioning of the adversarial process that the trial cannot be relied on as having produced a just

18   result." Strickland, 466 U.S. at 686.

19   Counsel's representation must have been "so defective as to require reversal of a conviction." Id. at

20   687.  To prevail on such a claim, the defendant must show that "counsel's performance was deficient," and

21   that "the deficient performance prejudiced the defense." Id.  Thus, unless both of these showings are made,

22   "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders

23   the result unreliable." Id.

24   There also is a "strong presumption" that the performance of counsel "falls within the 'wide range

25   of professional assistance.'" Kimmelman v. Morrison, 477 U.S. 365, 381 (1986).  With respect to attorney

26   performance, the proper standard to be used "is that of reasonably effective assistance" under "prevailing

27   professional norms." Strickland, 466 U.S. at 687-88.  Therefore, "the defendant must show that counsel's

28   representation fell below an objective standard of reasonableness." Id. at 688; United States v. Vincent,

758 F.2d 379, 381 (9th Cir. 1985) (defendant must show counsel's errors reflect failure to exercise skill,

judgment or diligence of reasonably competent attorney).

Counsel, furthermore, has "wide latitude in deciding how best to represent a client" and "making tactical decisions." Yarborough, 540 U.S. at 5; Strickland, 466 U.S. at 689. The competence of counsel "is presumed," and thus "[t]he reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances." Kimmelman, 477 U.S. at 381, 384. Not surprisingly, therefore, "the standard of review is highly deferential." Id. at 381. As the Supreme Court has explained:

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Strickland, 466 U.S. at 689 (citations omitted).

As noted above, to prevail on an ineffective assistance of counsel claim, the defendant also must "affirmatively prove prejudice." Id. at 693. In other words, it is not enough to show that "particular errors of counsel were unreasonable," and that they had "some conceivable effect on the outcome" of the trial. Id. Rather, it must be shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is that which is "sufficient to undermine confidence in the outcome." Id. When determining whether prejudice exists, the court "'must consider the totality of the evidence before the judge or jury.'" Kimmelman, 477 U.S. at 381 (citing Strickland, 466 U.S. at 695).

Petitioner sets forth a number bases for alleging that defense counsel's representation of him was ineffective, each of which shall be addressed separately below. None of those bases, however, have any merit. Therefore, for the following reasons, the undersigned finds the state courts' rejection of petitioner's ineffective assistance of counsel claim was neither "contrary to, or involved an unreasonable application of, clearly established federal law," nor "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d).

A.     There Was No Conflict of Interest Between Petitioner and Defense Counsel

1   Petitioner alleges there was an irreconcilable conflict of interest with defense counsel over the type

2   of defense that would be presented at trial.  Specifically, petitioner asserts that defense counsel wanted to

3   pursue an insanity or heat of passion theory, while he desired to pursue a theory of self-defense.  Because

4   defense counsel was prevented from being able to pursue her preferred theory, petitioner further asserts,

5   she retaliated against him by putting on only a pre-text of a self-defense case.  As such, petitioner argues,

6   defense counsel's loyalty was to the state, not to him.

7   Petitioner, however, misconstrues the term "conflict of interest."  Because the function of counsel

8   "is to assist the defendant," counsel owes the client "a duty to avoid conflicts of interest." Strickland, 466

9   U.S. at 688.  Thus, counsel has "an ethical obligation to avoid conflicting representations" of more than

10  one client. Cuyler v. Sullivan, 446 U.S. 335, 345-46 (1980); see also Washington Rules of Professional

11  Conduct 1.7(a) ("A lawyer shall not represent a client if the representation of that client will be directly

12  adverse to another client.").  Accordingly, a defendant who shows that his counsel "actively represented

13  conflicting interests" among multiple clients, and that those conflicts "actually affected the adequacy of his

14  representation," has "established the constitutional predicate" for a claim of ineffective assistance of

15  counsel. Cuyler, 446 U.S. at 349-50.  Such is not the case here.

16  On the other hand, counsel owes a "duty to advocate the defendant's cause." Strickland, 466 U.S.

17  at 688.  Petitioner alleges it was the intent of defense counsel that if he did not accept her heat of passion

18  theory, she would not investigate or otherwise help him pursue a theory of self-defense.  To support this

19  allegation, petitioner points to a document that defense counsel filed, outlining the defenses available to

20  petitioner, and indicating that defense counsel recommended a heat of passion defense. Petition, Exhibit E.

21  That document, however, merely shows that there was disagreement between petitioner and defense

22  counsel over trial strategy, not an irreconcilable conflict of interest.  As the Washington State Court of

23  Appeals found in denying petitioner's ineffective counsel claim:

24      Ramseyer makes numerous allegations of ineffective assistance, with the first being that
        irreconcilable conflict between him and his attorney denied him his Sixth Amendment
25      rights.  This conflict apparently stemmed from Ramseyer's desire to argue that he acted
        in self-defense and from his attorney's advice that he proceed on either an insanity or
26      heat of passion theory of defense.  Ramseyer prevailed, and the defense theory at trial
        was that he acted in self-defense.  The resolution of this conflict suggests that it was not
27      irreconcilable.

28  Record, Exhibit 31, p. 2.

    Petitioner argues that the conflict escalated and that defense counsel did not actively advocate for

1    him by, for example, putting the "Stipulated Facts" into evidence or challenging the "false testimony" of

2    the police detectives.  However, in light of the above discussion regarding the "Stipulated Facts," it cannot

3    be said that defense counsel was ineffective for failing to advocate its admission into evidence, and, in any

4    event, nothing in the record suggests defense counsel failed to actively cross-examine the state's witness or

5    to vigorously pursue the theory of self-defense.

6         In addition, how defense counsel chose to examine witnesses and pursue petitioner's defense are

7    presumed to have been reasonable. Strickland, 466 U.S. at 690 ("[C]ounsel is strongly presumed to have

8    rendered adequate assistance and made all significant decisions in the exercise of reasonable professional

9    judgment.").  Here, nothing in the record indicates that defense counsel failed to continue to advocate for

10   petitioner's cause, even though defense counsel recommended against pursuing a theory of self-defense.

11   Petitioner has not presented anything to rebut the presumption that this is so.

12        Petitioner further argues that the irreconcilable conflict of interest is evidenced by a letter he wrote

13   to the state trial judge, in which he expressed his concerns about defense counsel's representation of him.

14   Petition, Exhibit D.  Although petitioner alleges that letter was intercepted by defense counsel, there is no

15   indication in the record, other than his own word on the matter, that it was intercepted, nor is there any

16   indication that petitioner ever voiced his concerns to the court by other means, or moved for substitution of

17   counsel, either before or during trial.

18        Lastly, petitioner argues that a forensic psychological evaluation done prior to trial states that the

19   court "should" appoint a new attorney for him.  What that evaluation actually says, however, is that the

20   court "should give some consideration to possibly appointing" petitioner new counsel, in light of the

21   difficulties he reported having with his present attorney. Petition, Exhibit C, pp. 3-4.  In any event, as

22   discussed above, the record does not indicate petitioner actively attempted to change counsel, and this

23   document alone does not show there was an irreconcilable conflict.

24        B.    Defense Counsel's Actions Concerning "Heat of Passion"/"Sudden Quarrel Provocation"
                Defense Did Not Amount to Ineffective Assistance

25        Petitioner alleges an irreconcilable conflict of interest also was shown by defense counsel's failure

26   to pursue a "heat of passion"/"sudden quarrel provocation" defense.  This failure, petitioner asserts, shows

27   that defense counsel wanted to prove the state's jealousy theory and to reject any theory that supported his

28   theory of self-defense.  However, petitioner made clear prior to trial that he did not want defense counsel

to pursue a theory of heat of passion. Petition, Exhibit E, p. 2.  Defense counsel thus was estopped from putting on such a defense at trial.

Defense counsel also felt that a claim of self-defense and a heat of passion theory were "somewhat inconsistent" with each other. Record, Exhibit 30, at attached Exhibit P.  Further, as the Washington State Supreme Court Commissioner noted:

> Mr. Ramseyer says counsel failed to argue heat of passion based on sudden quarrel as an alternate defense.  But he does not explain how the mere fact that the victim allegedly pointed a gun at him might support a claim that he killed in the heat of passion.

Record, Exhibit 33, p. 2.  Petitioner now argues that a stranger who unexpectedly points a gun at him is a sudden provocation.  It is difficult to see how this would constitute a sudden provocation, when petitioner himself admittedly brought a shotgun into his ex-wife's house prior to confronting Mr. Beckstead, which would indicate petitioner thought that it might be needed.  In any event, as noted by the state courts, "any decision concerning what defense to employ was a matter of trial strategy that does not support a claim of ineffective assistance." Answer, Exhibit 31, p. 2, Exhibit 33, p. 2; Strickland, 466 U.S. at 689 (counsel must have wide latitude in making tactical decisions).

Defense counsel, furthermore, did submit, and object to the state trial court's failure to give, a jury instruction on whether petitioner acted in the heat of passion. Record, Exhibit 71, p. 674.  The trial court denied the objection, however, finding in relevant part:

> On the heat of passion, I don't believe he testified at any point that he acted in the heat of passion, or that he was overcome by emotions or anything of that nature such that it would constitute a so-called heat-of-passion killing rather than an intentional killing.

Record, Exhibit 71, p. 675.  While petitioner argues defense counsel refused to pursue this issue further, the record indicates defense counsel did try to convince the court, albeit unsuccessfully, that there were facts elicited at trial that he acted in the heat of passion. Id.  That defense counsel did not succeed in doing so, does not show that her representation of petitioner was ineffective. Strickland, 466 U.S. at 689 (court should not conclude act or omission of counsel was unreasonable merely because counsel's defense turned out to be unsuccessful).

C.   Defense Counsel's Decision Not to Obtain a Psychiatric Evaluation Does Not Constitute Ineffective Assistance

Petitioner argues defense counsel had a duty to investigate facts that supported his theory of self-defense, but failed to do so when she did not obtain a psychiatric evaluation that would have revealed his

REPORT AND RECOMMENDATION
Page - 25

1    mental capacity.  In particular, petitioner asserts that such an evaluation would have shown his ex-wife had

2    subjected him to a pattern of psychological abuse, which then would have explained his actions and how he

3    could not have formed the specific intent to kill Mr. Beckstead.

4           Counsel owes his or her client "a duty to make reasonable investigations or to make a reasonable

5    decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691.  In each case, the

6    decision not to investigate "must be directly assessed for reasonableness in all the circumstances, applying a

7    heavy measure of deference to counsel's judgments." Id.  Strategic choices that are made "after thorough

8    investigation of law and facts relevant to plausible options are virtually unchallengeable." Id. at 690.  If a

9    "less than complete investigation" is made, counsel's choices still are deemed "reasonable precisely to the

10   extent that reasonable professional judgments support the limitations on investigation." Id.

11          Accordingly, defense counsel does not have a duty "to uncover every aspect of a defendant's past

12   and to present all evidence that might bolster a defendant's mitigation case." Dyer v. Calderon, 113 F.3d

13   927, 943 (9th Cir. 1997), *superceded*, 122 F.3d 720, *vacated on other grounds*, 151 F.3d 970 (9th Cir.

14   1998).  Instead, because defense counsel's "resources are limited," a "strategic decision to emphasize

15   certain aspects of a defendant's background at the expense of investigating others is both reasonable and

16   wholly acceptable." Id.

17          As discussed above, given that petitioner unequivocally expressed his desire to not pursue a heat of

18   passion defense, defense counsel was not ineffective in failing to pursue such a defense at trial, and, to the

19   extent she did try to get the court to have the jury consider that defense, her actions were reasonable.

20   Accordingly, defense counsel's decision to forego further psychiatric evaluation of petitioner after trying to

21   obtain funds for such an evaluation, also was not unreasonable, particularly in light of her belief that a heat

22   of passion/sudden provocation defense would be inconsistent with a claim of self defense. Record, Exhibit

23   30, at attached Exhibit P, Exhibit 70, pp. 3-9.

24          In addition, it is not clear how any further psychiatric evaluation would have supported petitioner's

25   claim of diminished capacity.  As noted by the Washington State Supreme Court Commissioner:

26       Mr. Ramseyer contends counsel should have arranged to present expert testimony to
         support a diminished capacity argument.  According to a psychiatric evaluation prepared
27       by Western State Hospital, Mr. Ramseyer suffered from antisocial behavior and
         depression.  But neither of these conditions would support a diminished capacity
28       defense. *State v. Warden*, 133 Wn.2d 559, 564, 947 P.2d 708 (1997) (diminished
         capacity prevents the defendant from having the mental state necessary to commit the
         crime charged).  Again, it was likely a tactical decision by counsel to abandon this

1   defense.

2   Record, Exhibit 33, p. 2; Petition, Exhibit C, p. 3.  Thus, the Washington State Court of Appeals did not

3   err in finding as follows:

4        Ramseyer agues further that he received ineffective assistant when his attorney failed to
         provide him with a psychiatric evaluation, "as a partial defense to his claim of lawful
5        self-defense."  The record shows that when Ramseyer declined to follow his attorney's
         advice concerning an insanity defense, she decided against a psychiatric evaluation,
6        believing that a claim of self-defense was inconsistent with any mental defense.
         Counsel's actions went to the theory of the case and do not support an ineffective
7        assistance argument. *See In re Brown*, 143 Wn. 2d at 446.

8   Record, Exhibit 31, pp. 2-3.

9        D.    Petitioner's Contention that Defense Counsel Refused to Argue Any Facts to Support a
               Manslaughter Instruction Is Without Merit
10

11       Petitioner argues defense counsel was ineffective when she refused to argue any facts in support of

12  a manslaughter jury instruction, even after the state trial court already had rejected that instruction.  This

13  argument is meritless.

14       The trial court rejected defense counsel's instruction because petitioner "testified that the shooting

15  was intentional, so he's not entitled to a manslaughter reckless or negligent instruction." Record, Exhibit

16  71, p. 676.  In denying petitioner's claim on this issue, the Washington State Court of Appeals noted that a

17  manslaughter instruction is warranted where a defendant believed that he "needed to react to a threat in

18  self-defense but recklessly responded with more force than necessary to repel the attack." Record, Exhibit

19  31, p. 3.  It found that "[t]he evidence could not support a finding that Ramseyer responded with excessive

20  force; given that he was facing a man with a gun, he could not reasonably have believed he was in danger

21  without also reasonably believing that he needed to respond with deadly force." Id.  Given these facts, it

22  was not unreasonable for defense counsel to decline to argue with the trial court after it already indicated it

23  was not going to accept such an instruction.

24       E.    Ineffective Representation Is Not Shown By Defense Counsel's Decision Not to Further
               Impeach the Testimony of Petitioner's Ex-Wife
25

26       Petitioner alleges defense counsel was ineffective in failing to adequately impeach Mrs. Ramseyer

27  after she was re-called to testify concerning: (1) when petitioner was expected to arrive at the house, and

28  (2) why Mr. Beckstead felt he needed to bring a gun into the house.  This allegation, however, is wholly

    without merit as well.

         As summarized below by respondent, defense counsel's decision to limit her cross-examination of

REPORT AND RECOMMENDATION
Page - 27

1  Mrs. Ramseyer was most likely a strategic consideration, which was reasonable when viewed in light of the

2  totality of the circumstances at the time:

3          Mrs. Ramseyer was cross-examined by defense counsel.  She was asked about
   Mr. Ramseyer staying in her home in October and December of 1996 and January of
4  1997. Exhibit 70, Vol. III-A, at 247-48.  She elicited the information that Mr. Ramseyer
   could come and go from the family home. Id. at 248.  Mrs. Ramseyer testified that she
5  gave Mr. Ramseyer permission to stay in the home for two days. Id. at 249.  Mrs.
   Ramseyer was confronted about a previous interview statement where she had stated
6  that Mr. Beckstead was pointing the gun at Mr. Ramseyer before the third shot. Id. at
   260.  Mrs. Ramseyer was forced to admit that she did not remember, however, that her
7  previous response to the question of whether Mr. Beckstead was pointing the gun at Mr.
   Ramseyer, was that the gun was pointed at Mr. Ramseyer when he stood at the
8  bathroom area. Id. at 259-265.
           Mrs. Ramseyer was a hostile witness.  She had already testified that she felt
9  harassed by the defense attorney in a previous interview. Id. at 263.  After Adam
   Ramseyer gave his testimony with regard to informing Loretta and Rick of Mr.
10 Ramseyer's plan to arrive at 5 a.m. on Sunday morning, it was a strategic decision not to
   confront Mrs. Ramseyer with the identical question if she and Rick knew that Mr.
11 Ramseyer was arriving at 5 a.m.  The jury had already heard evidence impeaching Mrs.
   Ramseyer's story.  The possibility existed if Mrs. Ramseyer was asked these questions
12 during the defense phase of the trial, that she would offer other unknown evidence or
   seek to gain the sympathy of the jury.
13
   Answer and Memorandum of Authorities in Response to Petition for Writ of *Habeas Corpus* ("Answer"),
14
   pp. 41-42.  Thus, the Washington State Court of Appeals properly concluded:
15
           Ramseyer also contends that his attorney failed to impeach Mrs. Ramseyer properly and
16 failed to draw out certain testimony that would have supported his defense.  The State
   provides a transcript of counsel's extensive cross-examination of Mrs. Ramseyer.
17 Counsel closely examined her about her relationship with Ramseyer and about his ability
   to gain access to her home, which is where the crimes occurred.  The fact that Mrs.
18 Ramseyer and other family members have since provided affidavits altering some of the
   facts to which she testified does not establish that defense counsel was ineffective *during*
19 trial.

20 Record, Exhibit 31, p. 3 (emphasis added).

21          With respect to petitioner's claim that defense counsel should have exploited what Mrs. Ramseyer

22 meant when she told Detective Harper that "[w]e really have had it," it is clear that petitioner again has

23 intentionally misstated and distorted the record. Compare Petition, Ineffective Counsel Claim, p. 12, with

24 Petition, Exhibit A-1.  Accordingly, defense counsel did not unreasonably decline to further question Mrs.

25 Ramseyer regarding this statement at trial.

26          F.      Petitioner's Allegation that Defense Counsel Conspired with the State to Not Enter the
                   "Stipulated Facts" into Evidence or Cross-Examine Witnesses Is Without Merit
27
           Petitioner alleges defense counsel conspired with the state to keep the "Stipulated Facts" out of the
28
   evidence at trial and to not cross-examine or object to testimony elicited from the police detectives.  With

REPORT AND RECOMMENDATION
Page - 28

respect to this allegation, the Washington State Court of Appeals found as follows:

> Ramseyer also argues that defense counsel conspired with the State to solicit facts that negated a pre-trial stipulation and undermined his claim of self-defense. The stipulation he refers to was a pretrial stipulation offered to establish whether he would be entitled to instructions regarding self-defense and heat of passion. The stipulation was not a trial stipulation and was never offered into evidence. The fact that some of the State's witnesses offered testimony that expanded upon the facts set forth in the pretrial stipulation does not demonstrate that their testimony was perjured or that there was a conspiracy between defense counsel and the State to undermine Ramseyer's claim of self-defense.

Record, Exhibit 31, p. 4. Regarding the "Stipulated Facts" and perjured testimony, those issues already have been dealt with, and, as discussed above, rejected as being without merit. In addition, petitioner has provided no evidence that defense counsel and the state engaged in an actual conspiracy to convict him, or that they otherwise knowingly attempted to deceive petitioner or court. Rather, it appears petitioner is again merely attempting to retry this case on the merits.

### G. Defense Counsel Was Not Unreasonable in Failing to Insist the State Test Mr. Beckstead's Gun and Hand for Gun Powder Residue

Petitioner alleges defense counsel was ineffective by refusing to test Mr. Beckstead's hand for gun powder residue, even though he had stressed to her that this should be done. Petitioner asserts that such a test would have proved that Mr. Beckstead was aiming his gun at him when he fired the fatal shot. But, as the Washington State Court of Appeals noted:

> Ramseyer provides no evidence that such gun powder existed to be tested or that he ever requested such testing. Moreover, there is no indication that Beckstead ever fired his gun. Even if he did, any gunpowder on his hands would not have established where he was aiming when he fired. Therefore, Ramseyer does not succeed in showing that any such testing, even if appropriate, would have resulted in exculpatory evidence that his attorney was remiss in failing to address.

Record, Exhibit 31, p. 4. Thus, while the record indicates petitioner did tell Detective Harper that if the police looked at Mr. Beckstead's gun and hand they should be able to see marks where the shotgun pellets had struck, he has not demonstrated such testing would have shown where Mr. Beckstead was pointing the gun, nor does the record indicate he ever requested that defense counsel conduct such testing. Record, Exhibit 70, p. 523; Petition, Exhibit AA-1, p. 8. Given that in general defense counsel's "resources are limited," and that there was a real lack of evidence that such testing would be useful (Detective Harper testified that based on the crime scene photographs, there was no indication of any damage to the barrel of Mr. Beckstead's gun), defense counsel was not unreasonable in failing to insist that the testing be done. Record, Exhibit 70, p. 523; Dyer, 113 F.2d at 943.

REPORT AND RECOMMENDATION
Page - 29

H.    Defense Counsel Was Not Ineffective In Failing to Object and Move for Mistrial Because the State Referred to Mr. Beckstead as the Victim During Closing Arguments

Petitioner alleges defense counsel provided ineffective assistance by failing to object to and move for mistrial when the state referred to Mr. Beckstead as the victim during closing arguments.  Specifically, petitioner asserts by referring to Mr. Beckstead as the victim, it intentionally violated the state trial court's order not to do so.  This, however, is not an accurate reading of the record, as noted by the Washington State Court of Appeals:

> Ramseyer also argues that his counsel was ineffective in failing to object to the State's references to Beckstead as the victim during closing argument.  During the trial, the court directed certain witnesses to refrain from referring to Beckstead as the victim because of the defense theory that Ramseyer acted in self-defense.  During closing argument, however, the State was entitled to argue its theory of the case so long as that argument was supported by the evidence. *See State v. Hoffman*, 116 Wn.2d 51, 95 (1991).  There was evidence to support the State's theory that Beckstead was a victim.  Consequently, references to him as such during closing argument did not warrant objection.

Record, Exhibit 31, pp. 4-5.  Counsel, furthermore, "are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." Ceja v. Stewart, 97 F.2d 1246, 1253 (9th Cir. 1996).  Defense counsel thus cannot be faulted here for failing to object to the state's use of that term.

I.    Petitioner's Claim that Defense Counsel Lied to the Trial Court to Admit a Tape Recording and Refused to Argue Proper Grounds for Excluding It Are Without Merit

Petitioner alleges that defense counsel lied about when she listened to a tape recording showing he had made a violent threat to a third party, and that she then refused to properly argue for it to be excluded from the evidence at trial.  There is no indication in the record, however, that counsel lied about when she first listened to the tape recording. See Record, Exhibit 70, pp. 341-44.  While defense counsel argued unsuccessfully for the tape recording's exclusion, she did in fact argue for its exclusion. Id.; Strickland, 466 U.S. at 689 (court should not conclude that an act or omission of counsel was unreasonable merely because counsel's defense turned out to be unsuccessful).  Finally, the state trial court denied defense counsel's motion to exclude the tape recording on substantive, not procedural, grounds. Record, Exhibit 70, pp. 344.  As succinctly explained by the Washington State Court of Appeals:

> The fact that the attorney argued unsuccessfully for the exclusion of the tape recording does not indicate deficient performance.  Moreover, even if her argument had been successful, there is no reasonable probability that the outcome of the trial would have been different without the tape recording's admission.  In addition, the court specifically stated that it was denying the motion on substantive rather than procedural grounds, so

1   any explanation that defense counsel gave for the timing of her motion is irrelevant and
2   does not support an ineffective assistance claim.

3   Record, Exhibit 31, p. 5.  Thus, even if defense counsel had asserted other bases for excluding the tape

4   recording, petitioner has not shown there was a reasonable probability that it would have been excluded, or

5   that, if excluded, the outcome of the trial would have been different.

6       J.      Defense Counsel's Failure to Object to Detective Harper's Rebuttal Testimony Does Not
                Amount to Ineffective Assistance
7
8           Petitioner alleges defense counsel's representation was ineffective when she failed to object to

    Detective Harper's rebuttal statement, which, petitioner asserts, was improper because it allowed the state
9
10  to provide evidence of his intent.  However, as noted by the Washington State Court of Appeals:

11          Ramseyer also argues that his attorney should have moved to strike a detective's
            rebuttal testimony because the detective improperly testified as to Ramseyer's state of
12          mind.  Ramseyer also objects to rebuttal testimony concerning Beckstead's reputation
            for peacefulness.  The record show that the detective testified about what Ramseyer told
13          him following the shooting and not about his state of mind.  Furthermore, rebuttal
            testimony about Beckstead's reputation was proper because Ramseyer testified that
14          Beckstead was the aggressor. *See State v. Bius*, 23 WN. App. 807, 812 (1979).  There is
            no showing of deficient performance from the State's rebuttal testimony.

15  Record, Exhibit 31, pp. 5-6; see also Record, Exhibit 70, pp. 661-62.  Petitioner argues that Detective

16  Harper's testimony regarding the statement he made to him is different from what he actually had meant in

17  making that statement.  Once again, however, this essentially is an attempt by petitioner to retry this case

18  by arguing that his version of the events in question are true.  Accordingly, defense counsel did not act

19  unreasonably in failing to object to Detective Harper's rebuttal testimony.

20      K.      Defense Counsel's Representation of Petitioner Resulted in No Cumulative Errors

21          Petitioner argues that the cumulative effect of defense counsel's deficient performance fell so far

22  below the standard of adequate representation that his defense was prejudiced and he was denied the right

23  to effective counsel.  Having found no deficiencies in defense counsel's performance, however, there is no

24  such cumulative effect.  Accordingly, the Washington State Court of Appeals properly denied petitioner's

25  ineffective assistance of counsel claim for this reason as well. Answer, Exhibit 31, p. 6.

26      L.      Petitioner's "New Evidence" Does Not Establish Ineffective Assistance of Counsel

27          Petitioner alleges defense counsel's refusal to provide him with copies of the police reports shows

28  that she knowingly prejudiced his defense by: (1) refusing to cross-examine the police detectives on what

    petitioner told them regarding where Mr. Beckstead had pointed his gun; and (2) refusing to have the

REPORT AND RECOMMENDATION
Page - 31

"Stipulated Facts" entered into evidence to prove the state conceded those facts.  This argument also is completely without merit.  As discussed above, petitioner has not shown defense counsel was deficient in her examination of witnesses at trial.  So too has the issue of the "Stipulated Facts" been dealt with, and petitioner's allegation regarding them, rejected.

Finally, although defense counsel may have refused to give petitioner copies of those reports after his trial had concluded and defense counsel was no longer representing him, there is no indication in the record (other than petitioner's own allegations) that she kept them from him either prior to or during his trial. Petition, Exhibit FF-1; Exhibit GG-4.  Indeed, as discussed above, petitioner was able to eventually obtain copies of those documents on his own, and has not shown that he requested and was refused access to them prior to or during his trial.  Accordingly, here too, petitioner has failed to established he received ineffective assistance of counsel in violation of his Sixth Amendment rights.

<u>CONCLUSION</u>

For the reasons set forth above, the decisions of the state courts were not "contrary to, or involved an unreasonable application of, clearly established federal law," nor were they "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d).  Accordingly, the court should deny petitioner's federal petition for writ of *habeas corpus*.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. <u>See also</u> Fed.R.Civ.P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set this matter for consideration on **September 16, 2005**, as noted in the caption.

DATED this 24th day of August, 2005.

Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION
Page - 32